Good morning, Your Honor. I would like to begin my argument by showing that the Patent Office did not establish a crime of patient case with respect to the Halperin reference. Halperin is the primary reference, and we have agreement that the claim invention requires a medical device capable of measuring one or more physiological parameters, and it's even stated so clearly in the solicitor's brief in the very first sentence. The problem is Halperin, particularly Halperin and portable computer 22, is absolutely incapable of measuring anything. It is simply a screen with a GUI interface, graphic user interface. Therefore, you'll notice in the solicitor's brief, never are the claims read on portable computer 22 of the Halperin reference. And that's because if you attempt to read any of the independent claims on the portable computer 22, you'll see that numerous limitations cannot be met. And in particular, it can't be a medical device, thus it can't have a housing adapted to accommodate components of a medical device. And in the claims is explained what makes a medical device a medical device. It has to have an input capable of receiving an output signal from a physiological sensor. So there's a connection between a medical device and the patient. You do not have that with portable computer 22. In addition, the medical device must have a processor capable of receiving the output signal from the physiological sensor and determining display indicia. Obviously, a GUI interface portable computer 22 and Halperin can satisfy none of those limitations. Apparently, the solicitor thought our arguments were a catch 22. They're not a catch 22. What it is is the claims can't be read on Halperin, putting aside the multi-orientation. The claims cannot be read on Halperin, either whether you focus solely on portable computer 22, or whether you include the real medical device, which is module 16 in Halperin, which is necessary for the device to be considered a medical device, as I just explained. Well, it's a portable medical device. No, you the 22 is. Yes. It has a medical application, so it's a portable medical device. Is that wrong? That is wrong. What miss is there? Well, medical application is not in the claims. The claims are very specific that the input must be capable of receiving an output signal from a physiological sensor. That's much more specific than simply a medical application. So, in order to be a medical device, as the solicitor does receive an output signal, it receives a signal from the larger computer attached to the patient, right? Yes, but that signal is already processed. The measurement has already occurred. That's just output data. That, the patent refers to as monitoring the physiological measuring from the patient, has occurred in module 16. So, certainly, portable computer 22 could be anything. It could be a television set. It could be just any off-screen with a GUI interface. It has to receive a signal and display in Disha, and then it has an application requirement, which is met by Burrell. There's at least some sense in which all of this is found in 22, isn't there? No, because first of all, it's conceded portable device 22 cannot reorient itself. I think the solicitor liked Halpern because it showed a docking station. It is the only reference with a docking station. So, they made Halpern their primary reference because it has docking station 20. I'd like to move on to the docking station claims, and that's another problem. The docking station claims, it's not simply a mounting bracket. It's not simply something that passes electrical current or a charger. The docking station determines, or can also control, the orientation so that the device, when it's placed in the docking station, it orients according to the docking station. And those claims are what we would brief as the based on claims, based on the docking. The orientation is based on the docking, or when it's docked. And there's nothing in Halpern, the only reference with a docking station, there's nothing in Halpern that shows anything to do with controlling, of course, the orientation of Halpern, which is conceded. So, that's why this case came down to the relying on personal devices, no wire devices, like a PDA or a TomTom, what do you call those, GPS devices that are in your car. But those don't have wires to them. And our point about POSO, POSO has a wire coming out of it, and that's why POSO doesn't suggest turning it, rotating it, because you have wires connected to the patient. And so, I think the director's office went to the Halpern device because portable computer 22 has no wires, and therefore, somehow, it would suggest to rotate it. But there's nothing about rotation in Halpern. So, Halpern is a primary reference. We'd have to combine Halpern with others. Oh, yes. But, remember... Where do you find the motivation to combine? I don't. Matter of fact, you won't see any analysis in the board's opinion on motivation to combine. And you'll see a very high level analysis in the board's opinion on analogous art as well. And they seem to think analogous art and motivations combined are one. And that's not correct either. Even post-KSR, this court still continues to make sure that the references are analogous art. And KSR does not bypass that requirement, and it appears from the board's opinion that the board felt that KSR somehow greatly relaxed that standard for analogous art. And we submit that's not correct either. And so, if you go through the analysis, Halpern does not establish a primary facial case. Nothing shows the docking station claims. Then we have docking station affecting orientation. And then we have the non-analogous art problem with the personal computer, non-wired devices. And so, the primary facial case is very flaky, and I still have not seen anywhere in this record, any attempt by the patent office ever to read Halpern on portable computer 22. And that is not in their brief. It still isn't. And so, putting aside the orientation issue, you still have the problem about having an input capable of receiving an output signal from a physiological sensor, and you have the problem of no processor capable of receiving the output signal from that sensor and determining display indicia. But the key point is that a medical device measures. It measures. It doesn't simply display data. It measures, and that is beautifully set forth in the solicitor's brief in the very first sentence of the solicitor's brief. Ali Ali's claims a portable medical device capable of measuring one or more physiological parameters. It's the first, and we totally agree. But you'll notice when the solicitor starts talking about Halpern portable computer 22, the next sentence only says it displays physiological data. It doesn't say measures it. And so, even in the first two sentences of the solicitor's brief, I can see the concession that portable computer 22 does not measure, does not receive physiological signals, it's not a medical device, it is nothing but a portable screen with a GUI interface, which of course has a processor in it, but it doesn't process physiological data. That's a big, big difference. Let me ask you about the anatomist art issue. I suppose if you say that the art here is a medical device, then say a GPS looks pretty foreign. On the other hand, if you say that the art is a display, and the question is whether one would look to a GPS for display, then that's a much shorter leap. You wouldn't argue, I suppose, would you, that once you had established that a GPS device had the changing orientation feature, that say a telephone, let's say an iPhone, wouldn't be within the same analogous art with respect to the display, would you? Would a telephone? Yeah, in other words, you have a GPS, and the question is, somebody comes along and puts the orientation changing device into a telephone, Apple does. You wouldn't argue that, well, that's a completely non-analogous art, the GPS versus the telephone, both displays. Well, the telephone, when I heard the telephone, I think that's more problematic, is the telephone we grew up with was a wire. I understand, but take my example. You would not say that those are non-analogous arts because one deals with a GPS device and the other deals with a telephone, right? You would say that they're both displays, and therefore it's pretty easy to go from one display to another, right? Right, well, that's what the board did, the board assumed the problem. But wouldn't you agree with that example? If the issue was display, and you define the problem via the display... No, but somebody who was trying to argue in favor of patentability of the phone would say, no, no, the issue is not display, the issue is phone versus GPS, right? But that would be kind of a silly and awkward way to characterize analogous art, it would seem to me, in that context. I think so, I think so, I think the analogous art problem, I think it's very clear, you'll notice that they're going to devices that have no wires, like a GPS, and thinking, wow, because people turn these around, people would turn around medical devices that have wires to patients. And for that same reason, POSO doesn't suggest it, because POSO has a wire. So when I think of the telephone, I think of the telephone with a wire on it, saying, oh, anybody would know to put the earpiece and the mouthpiece and switch it. You don't think of that when you have wires coming off the devices. And for that matter, for this, thank you. I'd like to save the rest of my time for a while. Okay, Mr. Ray, Ms. Gilley. Good morning, Your Honor, say please to the court. The reason that our brief says that there's a device capable of measuring is because Claim 25 recites that in its preamble. It wasn't a concession on our part, it was a repetition of what the claims require. However, the claims don't require a cord, like Mr. Ray suggests. That's not part of the claim. The claims don't require that the device, the claim device, actually do any sensing. If you look at the claims, the sensor isn't part of the device. There's nothing about this device that's actually measuring anything. It just says you can receive an input from a sensor. The claims also recite the word comprising. Where is there any evidence that a person of skill in the arts would have made the multiple combinations? Well, they're not multiple combinations. We have two primary references that teach everything except for the dual display, PASO and Halpert. And then we have... Except for the dual display. Except for the dual display. So you've got to go to a third for that. No, no. So you've got multiple combinations. We go to one more for that. Yes, that's right. So you've got multiple combinations. PASO. What evidence is there that a person of skill would have made that combination? The evidence is the board and the examiner both found that someone making a portable medical device would want to more easily view the data output. And if you look at... That's a conclusion. Where's the evidence? I said where's the evidence? The only problem identified in Al Ali's own specification is the invention is focused on solving the problems of performance, incompatibility and transport problems. Nowhere did they say we're trying to solve space problems. This is on the record at A29. There's nothing in their specification about solving a space problem. Their own specification says our device is focused on solving problems of performance, incompatibility and transport. Let me try this again because I haven't heard an answer yet. When I look at all these references, I notice they're all very close in time. They're all references that were filed about the same time within a year or two at the patent office. Meaning that one inventor would not have known of what was happening in those other references. They would have all been secret prior art before the patent office. So how would one of skill in the art, and remember these are inventors. The art that you're showing me is combinations. They're all inventors. So they're more than a person of skill in the art. Why would one of skill in the art know of these various references in the first place? And in the second place, why would they make the combination? These references were, here's why. Because these references show that a couple of years before they filed their application, it was ubiquitous that everybody making a portable device was using a dual display monitor. We have a computer pad, we have a GPS, we have a camera, we have a computer viewing station. Four different types of devices, all a basic application for the most part filed in 1995, all issuing between 1997 and 1999. What did you say? My point again, inventors are indeed all trying to solve the same problem at the same time. Our question is whether one of skill in the art would have found this a routine, obvious thing to do to combine these references. Where is that at? Okay, if we're talking about motivation to combine, the motivation to combine and the board found this as did the examiner if you look to the record of A7, the board said that the motivation is to combine Halpern with Burrell or it's the same motivation for combining POSIT with Register, is to present the information in the easily viewed manner. And they refer you to where the examiner made the same finding in the examiner's answer in the record at 724. I remember looking at the board's opinion and I found very little on analogous, I mean on the motivation or anything that would have caused a person of skill in the art to make three combinations. Again, it's not three combinations, we have two separate combinations of two references. We have Halpern and Burrell and Burrell teaches the dual display, Halpern teaches everything else. We have PASO and Register. PASO teaches everything except the dual display, Register teaches that. And then you got to flip in the orientation with Lucente or the other ones. No, Lucente, those are for some of the, those are added in for some of the dependent claims that talk about how you sense the orientation. Those are not in all of those. I still have found nothing here that says a person of ordinary skill in the art is going to make this combination and why. Okay, if you look to the record at A7, the beginning of the first full paragraph says, appellants argue there is no motivation to combine Halpern and Burrell and you've already heard their reasons. The next sentence says, the examiner asserted that it would have been obvious to modify the display of Halpern's portable computer 22 by incorporating Burrell's at least two orientations so as to then went on to say that they were looking at the same question. Both Halpern and Burrell rely on displays to impart information to the user. Burrell teaches that the display can be modified by varying its orientation. Therefore, we do not find appellant's argument that there is no motivation to combine Halpern and Burrell persuasive. Yes, do you see my point? That does not convince me of anything. It states the, it states the conclusion. Well, it states, it does not say this is the reasoning that a person of ordinary skill, this is why they would have gone to look right here. It says only kind of what I said is that everybody was trying to do these, inventors were trying to do these things about the same time but where's one of ordinary skill in the art going to find it routine, ordinary, obvious, simple to do that? I think I'm really by the notion that an inventor isn't an ordinary person of skill in the art. I mean, oh that's our law going back as far as you can go that there's a difference between inventors who are super skilled and people of ordinary skill who are the ones who have to see it simple, obvious, routine to make these combinations. That's the obviousness standard. I disagree that that's this court's law that an inventor is someone who's super skilled. These, these, we are, we, and even if that were the court's law. You're going to have to go back and do a little research on that. I guess I will but a person of, these tests are looked at from the standard of a person of ordinary skill in the art. That's right. And a person of ordinary skill in the art would be motivated to combine these two references to increase the view. And the examiner made these similar findings. So the examiner, if you look at the record at A724, said it would have been obvious to one having ordinary skill in the art at the time of the invention, the time the invention was made to modify the display of helper to have at least two orientations with respect to the housing based on docking state of the housing as taught by Rorel. So as to present the information in an easily viewed manner. I mean the specification identifies the problem here of we want to improve, we want to improve the ability of our portable device to be able to monitor physiological parameters removed from. Let's talk about the secondary considerations. This won an award from the industry for, why wouldn't that have been of some significance? We're not saying that it's not of some significance, we're saying that it's not enough to carry the day. There are a couple of reasons. One is there is no nexus between, we would say that there is no nexus between the claimed invention and the success of this product. Ali now post hoc argues that the success of the invention is the dual display allows you to save space. We would assert that that's not colorable. However, if we look at this one embodiment, this court has said that a single embodiment can be sufficient to show, to carry the day on secondary considerations, to show that the invention itself, it has some sort of success. But in this case... You look at the industry award, it's talking about the small size, the rotating screen, these are invented features. Why is that not praised from the very industry that would know what one of skill in the art would find? The small size is not a claimed feature. Nowhere in this specification... Portable? A microwave with wheels would be portable. But no, I don't think even Ali would argue that it having solely based on a dual display, that it would save shelf space in the hospital or could be hung from a helicopter ceiling or could be put into a bed with a neonate. There's no size limitation in these claims. So if we had a medical device the size of a microwave and it had wheels, it would be portable, it wouldn't save space. Even if it had a dual display, it really wouldn't save much space. So it's very self-serving at this point, when the specification mentions nothing about space, to suddenly argue, well, this thing saves space and it's not really plausible... Would you agree that if the prior art you were asserting against a portable device, which is shown in the specification as handheld, was something with wheels, that that would be a pretty large leap? Well, we judge the invention based on the claims, not based on pictures of specification. In fact, if the USPTO started introducing a limitation from a figure in the specification in their claim, I submit that Mossimo would be quite unhappy. Because Mossimo does recite in their specification that the invention is handheld, but they've never chosen to put that into their claim. And they have related continuation applications that were at one time directed to handheld devices. So they are well aware that if they wanted a handheld device, they could have put that language into their claim. They did not. Even if they did, PASO is very clearly a handheld device. In fact, all of their teaching way arguments are based on the fact that, oh, it would be awkward to hold PASO like this. And the reality is that PASO need not be held in someone's hand like this. PASO, as PASO indicates, PASO can be mounted in an ID stand. There are any number of ways that PASO, this handheld primary reference, can be...well, I hesitate to say docked because we have no findings here, but it can lay in a bed with a patient. It can be transported by any number of means. So we have a very strong prima facie case of obviousness here where Halpern and PASO teach everything of Representative Claim 25 except the dual display. And that dual display, anybody looking to increase the viewability or the transportability of a medical device, which is the problem that the specification says Alali was trying to solve, would say, well, you know, everybody else making portable devices is...portable electronic devices is starting to include dual display. There's a motivation there to increase viewability. Even though there may have been a couple of years between when Register and Burrell and Nakano and Lucent came out, there's good evidence that dual display is fairly ubiquitous. Once they came out, everybody said, oh, let's use these. And Alali has presented no evidence that...no actual evidence, only arguments that that would not be the case. And... You touched on this earlier, but I just wanted to see if you had anything further that you wanted to say about the argument that Halpern is just a screen. It doesn't measure anything as such. Well, the claims don't require any measurement. The claims don't include a sensor. The sensor would be doing the measurement. And if you look to Halpern, what the claims say is that the processor receives output and determines the display. And Halpern very much teaches that. If you look to Halpern at page 808, column 5, lines 27 through 35, it says, the portable computer 22 includes a prominent CRT type display 24 and a dedicated processor. The display 24 may optionally be a touch screen to facilitate the inputting of information as it goes on. And then if we continue downward, it's this processor that determines the display. So we have something that does what the claim requires, which is to determine a display. If your honors have nothing further, I'll... Thank you, Ms. Gilley. Mr. Ray? Well, a processor to give a display is not in the claim. Physiological sensor can only be connected through a cable to the input. There's an input to receive it from the physiological sensor. With regard to the problem, I think I heard some new arguments that were not in the brief. For example, there now appears, she says, our statement of the problem is not colorable because it's not in the specification. That argument was never made before. And in fact, if you look at the board's opinion on JA 7, they stated our argument citing to our brief as to what were the needs of a medical device designer. That was never at issue. As if it was at issue for the examiner, we would have put in more declarations if that's what it would have taken. Next, also on JA 7, I think it was pointed out, you can see how the board merges the non-analogous art issues and the motivation to combine issue and merges them together in that critical paragraph on JA 7. And I think that is the error. They did not go through the proper findings on analogous art and then motivation to combine. There is no evidence on motivation to combine and you cannot simply collapse non-analogous art and say, oh, it might be analogous and therefore there is motivation to combine. That is improper. No substantial evidence supporting those findings. With regards to the nexus and the secondary considerations, there is also no debate that the claims read on my client's commercial device. That is not at issue. Never was challenged. And the dependent claims even read on the docking station that goes with the pulse oximeter. And there was never a debate about that. And so now I'm hearing for the first time where the board said there was no nexus. Now I'm hearing for the first time, oh, it's not that there is no nexus, which is what the solicitor's brief said. No nexus is repeated over and over. The issue isn't really whether the claims read on your device, right? Because your device may have features that both would infringe the claim if you were another party but go well beyond what would be necessary to infringe. And those additional features might be what really made the product unique. I think that's Ms. Kelly's argument. Well, that then, if that's the argument, and I'll go with that, you're now down to the probative value of the secondary consideration evidence. But that's not what the board did. The board said none of appellant's arguments or evidence accounts for the invention as it has been claimed. That we both treated as a finding of no nexus. No nexus. That's not what we have here. And I hear here, and I'll listen to the tape, Ms. Kelly was very clear in yielding a bit and saying, well that does not carry the day, is what she now said. As if it goes to the probative weight. Well, I don't want to sit here and argue about the secondary considerations because those were not treated by the board at all and that the entirety of the analysis by the board is that opening paragraph on JA-6 and that's it on secondary considerations. And there is no doubt that the award and the declarations and the secondary considerations do in fact go specifically to the multi-orientation feature, which we both agree is the additional subject matter not shown in the Pratt-Fish case. I have nothing further. I see my time is up. If there's any further questions, we'll call it a day. Thank you, Mr. Ray. Thank you.